COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Athey
Argued at Richmond, Virginia


TIMOTHY DANIEL PEERY

v.      Record No. 1669-24-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
FEBRUARY 17, 2026


FROM THE CIRCUIT COURT OF ORANGE COUNTY
Susan L. Whitlock, Judge Designate

Angela H. Williams (HarperWilliams, PLLC, on brief), for
appellant.

C. David Sands, III, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of Orange County convicted Peery of malicious

wounding of a nine-month-old child and assault and battery of the child's mother in violation of

Code §§ 18.2-51 and 18.2-57.2. Peery argues on appeal that the circuit court should have

excluded the testimony of the child's two medical doctors because the Commonwealth did not

fully comply with the circuit court's agreed discovery order. Peery also contends that the

evidence was insufficient to sustain the malicious wounding conviction because it did not prove

he had the specific intent to "maim, disfigure, disable, or kill" the child—or that he acted with

malice.[2] For the following reasons, we affirm the convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Peery does not challenge the sufficiency of the evidence for the assault and battery
conviction.

## I. BACKGROUND[3]

### A. *The Offense*

In January 2021, Tashyra Coles lived with Peery and her two sons, nine-month-old J.S. and three-year-old MC.[4] Peery was unemployed and looked after the children while Coles worked at Hair Cuttery. When Coles returned home from work on January 30, 2021, she noticed that J.S.'s "ear was sticking out from the side of his head" and that he "immediately started screaming when [she] opened the door and saw him." Coles testified that Peery told her J.S. "stood up and fell on his head in his crib" and he "just kept apologizing." Coles took J.S. to the hospital, and he remained there overnight.

Coles did not go to work the next day because she "didn't feel comfortable" leaving her son "looking the way that he did." Coles testified that after she refused to go into work despite Peery telling her to do so, he said, "you think I did this, don't you?" When Coles tried to call 911, Peery "knocked [her] down and took [her] phone so [she] couldn't get it." Coles eventually retrieved her phone from Peery and called the police.

Patrol Sergeant Robert Bragg responded to Coles's 911 call. He testified that when he first arrived at Coles's house, he observed that the side of J.S.'s face and head was swollen. When Sergeant Bragg asked what had happened to J.S., Peery "just said that [J.S.] had gotten hurt." Peery told Sergeant Bragg that he and Coles had been "arguing, fussing, and stuff" and he pushed her onto the bed, but he "didn't try to hit her." Peery left the residence after Coles told him he was no longer welcome to stay there.

---

[3] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

[4] We refer to the victim, who is a minor, and the victim's minor brother with initials in an attempt to protect their privacy.

Concerned about the injuries to J.S.'s face, Sergeant Bragg consulted with his lieutenant and another investigator. The three officers decided that the Department of Social Services "needed to open an investigation" regarding the child's injuries. Sergeant Bragg contacted the agency.

Sergeant Bragg later found Peery walking on the side of the road, and Peery agreed to speak with him at the police department.[5] After Peery was advised of his *Miranda*[6] rights, he said that J.S. "fell in the crib when they were taking a nap." Peery ended the interview when Lieutenant Madison entered the room because Peery "didn't like [Madison's] attitude." Peery agreed to continue the interview with Sergeant Bragg if Lieutenant Madison was not present. Peery then said that J.S.'s older brother had hit J.S. before and that J.S. "slipped and fell in the bathtub and hit his head" on the bathtub's spigot. Following the interview, Sergeant Bragg obtained warrants against Peery and arrested him. Sergeant Bragg interviewed Peery again after his arrest. Peery eventually told him that "he had hit [J.S.] in the side of the head and the highchair flipped over" because J.S. "was throwing food on the floor."

### B. The Proceedings

Perry's trial was set for January 5-6, 2023. The agreed discovery order required the Commonwealth to provide Peery with its witness list at least 30 days before trial. The Commonwealth filed the witness list on December 28, 2022. The next day, Peery's counsel filed a motion to exclude the testimony of the Commonwealth's witnesses because the Commonwealth had not given Peery its witness list until seven days before trial. In response, the

---

[5] Sergeant Bragg said during cross-examination that his conversations with Peery were recorded. Peery's counsel objected to the entirety of Sergeant Bragg's testimony because she had not been given the recordings. The circuit court continued the remainder of the trial so Peery's counsel could review the missing recordings. Peery has not challenged the admission of Sergeant Bragg's testimony on appeal.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Commonwealth filed alternative motions to continue the trial or enter a *nolle prosequi* order. The Commonwealth requested a continuance because two of its "professional fact and expert witnesses" were unavailable due to "extraordinarily high censuses for RSV, COVID, and the seasonal flu."

The parties met on January 5, 2023, for a hearing on Peery's motion to exclude.[7] After determining speedy trial was not an issue, the circuit court asked Peery's counsel "what prejudice would accrue" to Peery if the case were continued. Peery's counsel responded that "the Commonwealth has not complied with certain orders of this Court, not complied with discovery" and that a continuance "gives them a chance to fix it." The circuit court agreed that the Commonwealth had not complied with the discovery order and that Peery would be prejudiced if the case were tried that day because he had not been provided with "the requisite information to permit [him] to adequately prepare for trial." However, the circuit court ultimately granted the Commonwealth's request for a continuance over Peery's objection. The circuit court then denied Peery's counsel's motion to exclude the witnesses from the upcoming bench trial because the Commonwealth had already given Peery's counsel a chance to review the medical documents relevant to the case.

On February 14, 2023, the Commonwealth filed a "Notice of Commonwealth Compliance with 3A:11 Discovery Order and Notice of Fact and Expert Witnesses." The notice listed Dr. Elizabeth Schinstock and Dr. Joanne Mendoza as the Commonwealth's "[c]ombined expert and fact witnesses" and provided the following information about them:

> Dr. Elizabeth Shinstock, Orange Pediatrics[,] . . . is the victim's
> regular pediatrician and has been since his birth. As a fact witness,
> Dr. Schinstock will testify about the victim's general state of
> health and development prior to the incident on January 31, 2021,
> and his continued recovery from the injuries alleged to have

---

[7] During the hearing, the Commonwealth also stated that Coles could not be present at the scheduled trial date because she had COVID.

occurred as a result of the defendant's actions, specifically non-accidental closed head injury with a parietal (skull) fracture; liver damage due to trauma; acquired brain injury; and multiple bruising of his back, arms, and genitalia. As an expert witness, Dr. Schinstock will testify as to the long-term sequelae of this type of physical trauma when experienced by a nine-month-old child. The Commonwealth will seek to admit the office records kept in the usual course of her pediatric practice.

Dr. Johanna [sic] Mendoza, previously of the University of Virginia Department of Pediatrics, . . . was the treating physician at the University Hospital when the victim was transported to the University following the defendant's alleged assaults on the victim. As a fact witness, Dr. Mendoza will testify about the victim's state of injury upon his presentation in the Emergency Department, the course of care implemented, and the reasoning behind the designation that the injuries were a result of nonaccidental trauma, specifically a closed head injury with a parietal (skull) fracture; liver damage due to trauma; acquired brain injury; and multiple bruising of his back, arms, and genitalia. As an expert witness, Dr. Mendoza will testify as to the long-term sequelae of this type of physical trauma when experienced by a nine-month-old child. The Commonwealth will seek to admit the Medical Records kept in the usual course of caring for patients at the University of Virginia Medical Center.

On March 20, 2023, Peery's counsel filed an amended motion to exclude. Counsel argued that the Commonwealth's disclosures were insufficient because they had "not adequately stated what the expert's opinions are or the basis for those opinions." Counsel also noted that the Commonwealth had failed to "set forth the witnesses' qualifications and contact information pursuant to the Agreed [Discovery] Order."

On March 23, 2023, the parties entered into a plea agreement. The circuit court rejected the plea agreement after reviewing the presentence report and victim impact statement, and the case was again scheduled for trial on April 26, 2024.

The Commonwealth filed a list of the names and addresses of its witnesses on January 31, 2024. Peery's counsel filed a motion to exclude or limit the testimony of the Commonwealth's witnesses on April 19, 2024. Peery contended that the Commonwealth had

not provided contact information for the witnesses or designated whether they were fact or expert witnesses. Peery also asserted that the Commonwealth had "not adequately stated what the expert's opinions are or the basis for those opinions."

On April 26, 2024, before beginning the trial, the circuit court heard argument on Peery's motion to exclude the Commonwealth's witnesses and then denied the motion. Relying on Rule 3A:11(b)(4)(A), the judge explained that the fact that "the further explanatory language [required of the Commonwealth by Rule 3A:11] was not included in the notice and disclosure provided" did not mean the testimony of an expert witness is inadmissible. The judge said that "the fairly recent case of *Pease v. Commonwealth*"[8] had held the trial court did not abuse its discretion in denying the defendant's motion to exclude the witnesses from testifying, even though the Commonwealth's untimely disclosure violated the discovery order, because none of the witnesses were a surprise to the defense. The judge noted that defense counsel had not argued he was surprised by any of the witnesses.

The trial then began. However, after it was discovered that Peery's counsel had not received recordings of Peery's statements to the police, the circuit court continued the trial until May 29, 2024 so Peery's counsel could review those recordings. Before officially adjourning, Dr. Joanne Mendoza, who was qualified by the court as an expert and who was J.S.'s attending physician in the hospital, was allowed to testify.[9] She stated that, when J.S. arrived at the hospital, he had "swelling on the right side of the face and around the right eye, and redness around that right eye." She also testified that J.S. had "bruises in various places upon the body," including "a big bruise on the thigh, right thigh, and then there was also bruising at the scrotum

---

[8] *Pease v. Commonwealth*, No. 0846-22-1 (Va. Ct. App. June 13, 2023).

[9] Dr. Mendoza was pregnant, and there was a possibility she would not be able to attend the next scheduled hearing.

and the glands of the penis." Dr. Mendoza said that J.S. also "had a skull fracture in the right parietal bone, and then some soft tissue swelling external to the bone, and then he had elevations in his liver enzymes." Dr. Mendoza noted that elevated liver enzymes can signify "intra-abdominal injury," and indicated J.S. had internal bruising.

The trial concluded on May 29, 2024. Detective Adrienne Beale, who also interviewed Peery, testified that Peery initially said that J.S. fell in his crib, but he later said that he "hit the baby in the head with a closed-hand and opened-hand" while he was in highchair, and after the chair fell over, Peery "threw [J.S.] into the bathtub." Regarding the injuries to J.S.'s genitalia, Peery said that he "changes [J.S.'s] diaper rough, and he lifts his legs high in the air" and that after J.S.'s bath he "took the baby and threw him into his crib."

Dr. Elizabeth Schinstock, who had been J.S.'s pediatrician since his birth, testified that J.S. was "a healthy, normally developing baby." She said that when she saw J.S. on February 5, 2022, after he had been discharged from the hospital following his injuries, he "had some bruising up over his scalp and on his thigh, . . . a couple of abrasions, and that's about it." She also testified that she saw J.S. at regular intervals over the following nine months and that once his injuries healed, she observed nothing out of the ordinary about his condition.

Coles testified that after J.S. was injured, he cried and screamed when she tried to put him into his highchair, the bathtub, and his crib. She also said he did not want to be separated from her and "would just cry and cry and cry" if she left him with a caretaker.

The circuit court found Peery guilty of malicious wounding of J.S. and assault and battery of Coles. The court sentenced Peery to serve a total active sentence of five years and six months. He timely noted his appeal to this Court.

## II. ANALYSIS

### A. *Discovery Violation*

Peery contends that the circuit court should have excluded the testimony of Drs. Mendoza and Schinstock because the Commonwealth's disclosures about its expert witnesses were "deficient" in violation of the agreed discovery order.[10] Peery argues that the Commonwealth did not make all of the disclosures in a timely manner and did not disclose "exactly" the physicians' expected trial testimony and "what portions of the voluminous [medical] records" were the basis of their opinions.

Whether a trial court erred in admitting or excluding evidence is reviewed on appeal under an abuse of discretion standard. *Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023). Whether the trial court erred in ruling on alleged discovery violations pursuant to Rule 3A:11 is also reviewed for an abuse of discretion. *Id.* at 472.

A major purpose of discovery is to eliminate surprise at trial. *Little v. Cooke*, 274 Va. 697, 718 (2007). In criminal cases, Rule 3A:11 requires the Commonwealth, "[u]pon written motion of an accused," to:

> Notify the accused in writing of the Commonwealth's intent to introduce expert opinion testimony at trial or sentencing and to provide the accused with: (i) any written report of the expert witness setting forth the witness's opinions and the bases and reasons for those opinions, or, if there is no such report, a written summary of the expected expert testimony setting forth the witness's opinions and the bases and reasons for those opinions, and (ii) the witness's qualifications and contact information.

Rule 3A:11(b)(4)(A). The rule also provides that:

> Nothing in subparts (b)(4)(A)(i) and (ii) of this Rule renders inadmissible an expert witness's testimony at the trial or

---

[10] The Commonwealth argues on brief that Peery waived this assignment of error because his opening brief cited no authority pertinent to discovery and raised a different argument than the one made at trial. *See* Rules 5A:18 and 5A:20(e). The Court assumes without deciding that Peery preserved his assignment of error.

> sentencing further explaining the opinions, bases and reasons disclosed pursuant to this Rule, or the expert witness's qualifications, just because the further explanatory language was not included in the notice and disclosure provided under this Rule.

Rule 3A:11(b)(4)(B).

In this case, the agreed discovery order required the Commonwealth to provide Peery with its witness list and certain information about the expert witnesses at least 30 days before trial. At the first hearing on Peery's motion to exclude the Commonwealth's witnesses, the circuit court found that the Commonwealth had not complied with the discovery order. However, the judge granted the Commonwealth's motion for a continuance over Peery's objection and set a new trial date.[11] The court also ruled that the Commonwealth's expert witnesses were not excluded from testifying because the Commonwealth had provided Peery's counsel an opportunity to review the relevant medical records.

The Commonwealth timely filed another witness list before the hearing set for March 23, 2023. Peery moved to exclude the testimony of the expert witnesses, but the circuit court did not rule on the motion because the parties entered into a plea agreement, which the court ultimately rejected. The Commonwealth then timely filed a third witness list. Peery again moved to exclude, alleging that the Commonwealth had not stated adequately the expert witnesses' opinions or the basis for them. The circuit court denied the motion to exclude, holding the witnesses' testimony was admissible.

Because the Commonwealth failed to comply fully with the agreed discovery order, Peery was entitled to seek relief by moving to exclude the expert witness testimony. However, the relief to be given is left to the trial court's discretion. *See* Code § 19.2-265.4(B) (stating that,

---

[11] Peery objected to continuing the case because doing so would give the Commonwealth "a chance to fix" the failure to comply with the discovery order. Arguably, the underlying purpose of the motion to exclude was to handicap the Commonwealth in presenting its case.

when the Commonwealth violates Rule 3A:11, the trial court "may order the Commonwealth to permit the discovery or inspection, grant a continuance, or prohibit the Commonwealth from introducing evidence not disclosed, or the court may enter such other order as it deems just under the circumstances"). The dispositive question before this Court is whether the circuit court's ruling was an abuse of discretion, which, in turn, considers whether Peery was prejudiced by the ruling. In determining the relief to be granted for a discovery violation, the trial court must "giv[e] due regard to the right of the accused to call for evidence in his favor and to investigate and evaluate the evidence in preparation for trial." *Frye v. Commonwealth*, 231 Va. 370, 383 (1986). "When a discovery violation does not prejudice the substantial rights of a defendant, a trial court does not err in admitting undisclosed evidence." *Davis v. Commonwealth*, 230 Va. 201, 204 (1985).

Peery has not established that he was prejudiced by the Commonwealth's failure to state the exact topics on which the two physicians would be testifying and the specific information on which they would be relying. "To show prejudice, the defendant must demonstrate how timely disclosure would have changed his trial strategy or affected the outcome of the trial." *Harvey*, 76 Va. App. at 473 (quoting *Smoot v. Commonwealth*, 37 Va. App. 495, 502 (2002)). Peery knew that Dr. Schinstock, J.S.'s regular pediatrician, and Dr. Mendoza, J.S.'s treating physician at the hospital, were expected to testify for the Commonwealth. The child's medical records were available to Peery. He knew from the information that the Commonwealth provided that the substance of their testimony would pertain to J.S.'s injuries and his health before and after he was seriously harmed by Peery.

Importantly, the disclosure violation did not affect the outcome of the trial. Without objection from Peery, Dr. Mendoza was qualified as an expert in pediatrics, but she testified only as a fact witness regarding J.S.'s injuries, based on her own or her colleagues' observations of

the child.  *See Lafon v. Commonwealth*, 17 Va. App. 411, 421 (1993) (holding that a witness's statements that he "knew" the defendant had committed murder were not "overt expressions of opinion," but, rather, "impressions drawn from collected, observed facts").  Dr. Schinstock was not qualified as an expert, and her testimony was based solely on her experience as the child's pediatrician.[12]  Peery argues that the "opinions expressed by the doctors were crucial in establishing injuries to the child."  But the doctors' descriptions of J.S.'s injuries and general health were not "opinions."  Neither doctor was asked to state her opinion whether J.S.'s injuries were consistent or inconsistent with a nonaccidental injury.  *Cf. Price v. Commonwealth*, 18 Va. App. 760, 763-66 (1994) (a doctor, qualified as an expert witness, stated his opinion that the child's condition showed a "pattern of intentional physical abuse" known as "battered child syndrome").  Furthermore, J.S.'s medical records were redacted to omit any reference to the cause of his injuries as suspected or confirmed "nonaccidental trauma."[13]

As the circuit court noted in making its ruling, Peery did not argue that either doctor was a surprise witness.  Thus, a key reason the discovery rules exist—to ensure the parties are not surprised by each other's position—is met in this case.  Allowing the physicians to testify was not an abuse of discretion under the facts of the case.  *See Harvey*, 76 Va. App. at 473 (holding that the trial court did not abuse its discretion by admitting the challenged evidence because the defendant did not establish prejudice).

---

[12] Peery did not cross-examine Dr. Schinstock.

[13] At the hearing on April 26, 2024, the medical records were marked "for identification only" because Peery raised a hearsay objection to some comments contained in them.  The parties agreed to redact the records, and they were admitted at the next hearing on May 29, 2024.  The portions of the records that the court was not to consider were highlighted in yellow.

*B. Sufficiency of the Evidence to Prove Malicious Wounding*

Peery argues that the use of bare fists to injure another, unaccompanied by violence and brutality, is generally not enough to prove a person guilty of malicious wounding. He also contends that there is no direct evidence to show he acted with malice or intended to "maim, disfigure, disable, or kill" J.S.

*1. Standard of Review*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration and emphasis in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "[W]e consider the evidence presented at trial in the light most favorable to the Commonwealth, [as] the prevailing party below. 'We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence.'" *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008) (citations omitted) (quoting *Riner v. Commonwealth*, 268 Va. 296, 303 (2004)).

*2. Proof of Intent to "Maim, Disfigure, Disable, or Kill"*

"If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony." Code § 18.2-51. "Intent is a state of mind which can be evidenced only by the words or conduct of the person who is claimed to have

entertained it." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (quoting *Banovitch v. Commonwealth*, 196 Va. 210, 216 (1954)). "Intent may, and often must, be inferred from the facts and circumstances of the case, including the actions and statements of the accused." *Commonwealth v. Taylor*, 256 Va. 514, 519 (1998).

Cases applying Code § 18.2-51 have stated that although "a single blow with a bare fist" is not sufficient under ordinary circumstance to prove malicious wounding, an intent to injure may be presumed from a brutal and violent assault with a bare fist. *Burkeen*, 286 Va. at 258; *see, e.g.*, *Fletcher v. Commonwealth*, 209 Va. 636, 640-41 (1969); *Shackelford v. Commonwealth*, 183 Va. 423, 426-27 (1945). Convictions for malicious wounding were affirmed in these cases because the defendants unexpectedly hit the defenseless victims with extreme force causing serious injuries. The Supreme Court concluded from the circumstances in these cases that the defendants acted with the requisite intent, as well as with malice.[14]

Similarly, in *Johnson v. Commonwealth*, 53 Va. App. 79 (2008), this Court held that a single blow with one's fist can justify a conviction under Code § 18.2-51. The Court analyzed three factors in determining whether the defendant acted with the requisite intent to permanently injure the victim in that case. First, the victim "did nothing to provoke Johnson's attack." *Id.* at 103. Second, "Johnson employed great force in striking" the victim because the victim "suffered a concussion, two cuts in his ear, one of which necessitated four stitches, and soreness in his shoulder lasting several weeks." *Id.* at 104. Third, the Court noted that Johnson had carried out "a premeditated attack to punish" the victim. *Id.* Considering the brutality of the attack, this Court stated that fists "become most deadly, by blows often repeated, long continued, and

---

[14] In contrast, the Court found no intent to inflict serious bodily injury and reversed a malicious wounding conviction in *Roark v. Commonwealth*, 182 Va. 244 (1944), where the defendant knocked the victim to the sidewalk with his fist during an argument and then took him to the hospital and offered to pay his medical expenses. *Id.* at 246.

applied to vital and delicate parts of the body of a defenceless unresisting man, on the ground." *Id.* at 101 (quoting *M'Whirt's Case*, 44 Va. (3 Gratt.) 594, 611 (1846)).

In determining whether there is sufficient evidence of intent to prove malicious wounding, a court may "consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted." *Burkeen*, 286 Va. at 260. Here, the circuit court had more than enough evidence to find that Peery had the requisite intent to permanently maim, disfigure, disable, or kill J.S. The evidence showed that Peery punched nine-month-old J.S. in the side of the head while he sat in his highchair with such force that the chair fell over and J.S.'s skull cracked when his head hit the floor. The evidence further established that Peery then "threw" J.S. into the bathtub, where he hit his head on the faucet, and later "threw" the child into his bed after his bath. Peery also admitted to Detective Beale that he changed J.S.'s diapers in a "rough" manner. J.S.'s facial injuries were so great that when Sergeant Bragg saw the child two days after the injuries had been inflicted, he immediately concluded that social services should investigate. Dr. Mendoza testified that J.S. had a skull fracture, internal bruising in his abdomen, and bruising on his thighs and genitalia.

The circuit court reasonably could conclude from Peery's conduct that he intended to maim, disfigure, disable, or kill J.S. because it may be inferred that "every person intends the natural and probable consequences of his or her acts." *Brown v. Commonwealth*, 74 Va. App. 721, 734 (2022) (quoting *Walker v. Commonwealth*, 47 Va. App. 114, 121 (2005)). "In determining the probable consequences of an aggressor's actions and his or her intent to achieve those consequences, the comparative weakness of the victim and the strength of the aggressor may be considered." *Campbell v. Commonwealth*, 12 Va. App. 476, 485 (1991) (en banc). Peery, who was nearly six feet tall and weighed 208 pounds, was clearly the aggressor in this case; nine-month-old J.S. was unquestionably the defenseless victim. In a case such as Peery's,

"[w]here [the] victim is significantly weaker than [the] aggressor, a physical attack is more likely to cause severe bodily injury." *Id.* (affirming conviction for malicious wounding where the defendant brutally beat a three-year-old boy). Also, given Peery's numerous and varied statements about how J.S. was injured, the circuit court was "entitled to disbelieve [Peery's] self-serving [statements] and to conclude that he was lying to conceal his guilt." *Brown*, 74 Va. App. at 734 (quoting *Woodard v. Commonwealth*, 27 Va. App. 405, 408-09 (1998)). Thus, the circuit court's ruling that Peery acted with the requisite intent to sustain a conviction for malicious wounding was not plainly wrong or lacking supporting evidence.

### 3. *Proof of Malice*

Peery argues that he was simply acting out of frustration, which was not enough to justify the circuit court's finding that he acted with the necessary level of malice.

"Whether an appellant acted with malice is a question of fact to be determined by the fact finder." *Doss v. Commonwealth*, 23 Va. App. 679, 685 (1996). "At common law, malice was defined 'as any evil design in general: the dictate of a wicked, depraved, and malignant heart.'" *Watson-Scott v. Commonwealth*, 298 Va. 251, 255 (2019) (quoting 4 William Blackstone, *Commentaries* *198). Virginia appellate courts have defined malice as "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Id.* at 255-56 (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)); *see Bennett v. Commonwealth*, 84 Va. App. 607, 621 (2025). Malice may "be either express or implied by conduct." *Essex v. Commonwealth*, 228 Va. 273, 280 (1984). "The concept of implied malice is based on the notion that the defendant intentionally acts, even though he knows his actions are wrong and so inherently dangerous that they could result in death." *Watson-Scott*, 298 Va. at 256. "Malice is implied from any willful, deliberate and cruel act against another." *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991).

The circuit court's conclusion that Peery acted with malice was not plainly wrong or without supporting evidence. The court could consider the nature of the crime at issue here—an attack on a nine-month-old child—and the resulting severe injuries to that child. J.S. suffered multiple injuries on different parts of his body, thus indicating that Peery's assault and battery on J.S. was not a single incident. J.S.'s injuries support a reasonable inference that Peery did not act out of a momentary lapse in judgment because he was simply "frustrated" with having to look after Coles's children. The circuit court also could consider that Peery did not seek help after he injured J.S., that Peery assaulted Coles to keep her from notifying the police, and that Peery repeatedly lied when pressed to explain the child's injuries. The totality of the circumstances proved that Peery acted with malice, and a rational factfinder could certainly so conclude. *See Bennett*, 84 Va. App. at 623 (holding that the defendant's violent, brutal, lengthy, and unprovoked attack on his neighbor "amply supported" the jury's finding that he acted with malice).

## III.  CONCLUSION

For all of the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*